573 So.2d 306 (1990)
STATE of Florida, Petitioner/Cross-Respondent,
v.
Roland SMITH, Respondent/Cross-Petitioner.
No. 73822.
Supreme Court of Florida.
December 20, 1990.
Rehearing Denied February 12, 1991.
*308 Robert A. Butterworth, Atty. Gen. and Carol M. Dittmar, Asst. Atty. Gen., Tampa, for petitioner/cross-respondent.
James Marion Moorman, Public Defender and Deborah K. Brueckheimer, Asst. Public Defender, Tenth Judicial Circuit, Bartow, for respondent/cross-petitioner.
PER CURIAM.
We review Smith v. State, 539 So.2d 514 (Fla. 2d DCA 1989), in which the Second District Court of Appeal reversed Smith's conviction and certified two questions as being of great public importance.[1] For the reasons stated below, we approve the district court's decision ordering a new trial, but we quash the opinion and remand for proceedings consistent with this opinion.
Smith was charged with first-degree murder and presented at trial some evidence of excusable homicide. Evidence showed that in March 1986, Roland Smith, the defendant, and Josette Estes, had just begun living together in Pasco County, Florida. Estes was Smith's seventeen-year-old stepdaughter from a prior marriage, with whom he was having a sexual relationship. Smith was a friend of the victim, John Cascio. On March 6, 1986, Cascio and Estes left Smith's residence to make a telephone call, whereupon Cascio made sexual advances to Estes. Estes rejected the advances and became upset. When they returned, Smith asked why Estes appeared to be so upset. Estes described the incident to Smith. Smith asked Cascio to leave, but Cascio refused. Smith grabbed Cascio and picked up a gun that had been sitting out on a table all night. Estes testified that Cascio said to Smith, "Why don't you put the gun where your mouth is?" Cascio then motioned toward Smith's face and moved toward him. Smith tried to keep Cascio away but Cascio persisted. Smith testified that he yelled for Cascio to stop, and when he did not, Smith fired. Estes testified that Cascio nudged Smith and the gun went off. Cascio died of a gunshot wound to his head.
In support of his claim of self-defense, Smith testified that when he shot Cascio, *309 he knew that Cascio had an extensive history of violent crime, that Cascio was a reputed "Mafia" figure, that Cascio had attacked him previously, and that Cascio usually carried a gun. Smith said he picked up his own gun because he feared that Cascio was carrying a gun at the time. Other testimony showed that Cascio had a reputation in the community for violence, for carrying a gun, and for being associated with the "Mafia."
At the close of the trial, the judge gave the standard jury instructions on homicide, which included the short-form definition of excusable homicide. The trial judge did not give the long-form instruction on excusable homicide. Defense counsel did not object to the short-form instruction on excusable homicide. He neither requested a long-form instruction on excusable homicide nor objected to the failure to give it. Smith was convicted of second-degree murder. The district court reversed and remanded the case for a new trial.
In reviewing Smith's convictions, the Second District Court of Appeal first posed the following certified question:
WAS THE FAILURE TO GIVE THE LONG FORM INSTRUCTION ON THE DEFENSE OF EXCUSABLE HOMICIDE FUNDAMENTAL ERROR WHEN THE SHORT FORM EXCUSABLE HOMICIDE INSTRUCTION HAD BEEN GIVEN, WHEN THE DEFENDANT HAD NEITHER REQUESTED THE LONG FORM INSTRUCTION NOR OBJECTED TO THE GIVING OF THE SHORT FORM INSTRUCTION, AND WHEN THAT DEFENSE WAS SUPPORTED BY THE EVIDENCE?
Smith, 539 So.2d at 517-18. The court reasoned that this question should be answered in the negative. The second certified question read:
WHEN A DEFENDANT WAS CONVICTED OF SECOND-DEGREE MURDER, WAS THERE FUNDAMENTAL ERROR WHEN THE TRIAL COURT HAD FOLLOWED THE STANDARD JURY INSTRUCTIONS AND GIVEN THE SHORT FORM INSTRUCTION ON EXCUSABLE HOMICIDE AT THE OUTSET OF THE HOMICIDE INSTRUCTIONS AND HAD GIVEN NO FURTHER INSTRUCTION ON EXCUSABLE HOMICIDE IN CONNECTION WITH ITS INSTRUCTION ON MANSLAUGHTER?
Id. at 520. Because the court below believed that this question should be answered in the affirmative, it reversed Smith's conviction and remanded for a new trial. The state petitioned this Court to answer the certified questions. Smith filed a cross-petition alleging a series of additional errors.
Before addressing the certified questions, we note that the Florida Standard Jury Instructions in Criminal Cases includes two definitions of excusable homicide. The short form is part of the Introduction to Homicide, which is to be read in all homicide cases. This instruction reads as follows:
EXCUSABLE HOMICIDE
F.S. 782.03
The killing of a human being is excusable, and therefore lawful, when committed by accident and misfortune in doing any lawful act by lawful means with usual ordinary caution and without any unlawful intent, or by accident or misfortune in the heat of passion, upon any sudden and sufficient provocation, or upon a sudden combat, without any dangerous weapon being used and not done in a cruel or unusual manner.
I now instruct you on the circumstances that must be proved before (defendant) may be found guilty of (crime charged) or any lesser included crime.
Fla.Std.Jury Instr. (Crim.) at 61. Following the Introduction to Homicide, there is a note in the standard jury instructions that directs the judge to the long-form instruction on excusable homicide if that defense is an issue. The long-form standard jury instruction reads as follows:
EXCUSABLE HOMICIDE
F.S. 782.03
An issue in this case is whether the killing of (victim) was excusable.

*310 The killing of a human being is excusable if committed by accident and misfortune.
In order to find the killing was committed by accident and misfortune, you must find the defendant was:
Give 1, 2 or 3 as applicable
1. a. doing a lawful act by lawful means and with usual care and
b. acting without any unlawful intent.
2. in the heat of passion brought on by a sudden provocation sufficient to produce in the mind of an ordinary person the highest degree of anger, rage or resentment that is so intense as to overcome the use of ordinary judgment, thereby rendering a normal person incapable of reflection.
3. engaged in sudden combat. However, if a dangerous weapon was used in the combat or the killing was done in a cruel or unusual manner, the killing is not excusable.
Definition
A "dangerous weapon" is any weapon that, taking into account the manner in which it is used, is likely to produce death or great bodily harm.
Fla.Std.Jury Instr. (Crim.) at 76.
The issue before the district court of appeal with respect to the first question was whether it was fundamental error not to give the long-form instruction on excusable homicide when there was evidence to support that defense. In this respect, we agree with the district court when it said that to hold fundamental error occurred because of the failure to give the long-form instruction on excusable homicide when it was not requested "would place an unrealistically severe burden upon trial judges concerning a matter which should properly be within the province and responsibility of defense counsel as a matter of trial tactics and strategy." Smith, 539 So.2d at 517.
In normal cases the failure to request an instruction precludes a later contention that such instruction should have been given. Adams v. State, 412 So.2d 850 (Fla.), cert. denied, 459 U.S. 882, 103 S.Ct. 182, 74 L.Ed.2d 148 (1982). Fundamental error occurs in cases "where a jurisdictional error appears or where the interests of justice present a compelling demand for its application." Ray v. State, 403 So.2d 956, 960 (Fla. 1981). Here, the trial judge gave the short-form instruction on excusable homicide. The failure to give the long-form instruction when it was not requested did not constitute fundamental error. Hence, we answer the first certified question in the negative.
The second certified question deals with the definition of excusable homicide as it relates to the definition of manslaughter. Because manslaughter is in the nature of a residual offense, a complete definition of manslaughter requires an explanation that justifiable homicide and excusable homicide are excluded from the crime. Hedges v. State, 172 So.2d 824 (Fla. 1965). In Rojas v. State, 552 So.2d 914 (Fla. 1989), this Court held that a conviction of second-degree murder, when the trial court initially instructed on manslaughter without making any reference whatsoever to justifiable and excusable homicide, must be reversed even though the defendant's lawyer did not object to the instruction. We rejected the contention that the jury's affirmative finding that the killing was done with "a depraved mind regardless of human life" rendered harmless the erroneous definition of manslaughter. We also stated:
The fact that the judge defined excusable and justifiable homicide in the beginning of the homicide instructions did not suffice to make the manslaughter instruction legally adequate. Recognizing the need to refer to justifiable and excusable homicide in the context of defining manslaughter, this Court in 1985 approved a recommendation of the Standard Jury Instructions Committee to add after the definition of the elements of manslaughter the following language:
However, the defendant cannot be guilty of manslaughter if the killing is either justifiable or excusable homicide as I have previously explained those terms.[2]
[2] In view of the fact that the standard jury instructions already provide for the definitions *311 of justifiable and excusable homicide to be given during the trial judge's introductory remarks, the current standard jury instruction on manslaughter adequately reminds the jury that justifiable and excusable homicide are not contained within the definition of the crime. However, because reinstructions often occur several hours later, a note was added which advised the judge that in the event of any reinstruction on manslaughter, the original instructions on justifiable and excusable homicide should be given at the same time.
Id. at 916 & 916 n. 2.
In the instant case, the trial judge gave the current standard jury instruction on manslaughter in its entirety, including the reference to his previous definition of justifiable and excusable homicide. The instruction on manslaughter was not erroneous in any respect. Therefore, we also answer the second question in the negative.
While not resting its decision on the point, the district court observed that the short-form definition of excusable homicide may be misleading and referred to its earlier decision in Blitch v. State, 427 So.2d 785 (Fla.2d DCA 1983). In Blitch, the defendant was convicted of second-degree murder for killing the victim with a shotgun. There was evidence at the trial that would have supported a defense of excusable homicide. The trial judge denied the defendant's request to give the long-form instruction on excusable homicide, surmising that the short-form instruction on the subject was sufficient. In reversing the conviction, the Second District Court of Appeal held that the short-form instruction on excusable homicide may have been misleading in that it could be construed to suggest that a killing can never be excusable if committed with a dangerous weapon. The court explained:
[T]he jury could have easily misconstrued the instruction in the following manner:
The killing of a human being is excusable, and, therefore, lawful
[1] when committed by accident or misfortune, in doing any lawful act by lawful means with usual, ordinary caution and without any unlawful intent,
[2] or by accident or misfortune in the heat of passion, upon any sudden and sufficient provocation or upon any sudden combat,
without any dangerous weapon being used, and not done in a cruel or unusual manner.
Id. at 787. Accord Bowes v. State, 500 So.2d 290 (Fla. 3d DCA 1986), review denied, 506 So.2d 1043 (Fla. 1987).
Ironically, the short-form standard jury instruction on excusable homicide expressly tracks the definition of excusable homicide contained in section 782.03 of the Florida Statutes (1987). Thus, the statute itself is susceptible to the argument that the definition of excusable homicide is not entirely clear. The statute could be read to mean that a killing can never be excusable if committed with a dangerous weapon. However, we are satisfied that the more reasonable construction of the language limits the caveat concerning a dangerous weapon to the third alternative of sudden combat. If this were not the legislative intent, a purely accidental killing with the use of a gun could not be considered excusable homicide. To preclude the possibility that a jury could have a contrary understanding, we amend the short-form instruction.[2] Thus, the short form of the jury instruction on excusable homicide found on page 61 of the Standard Jury Instructions shall now read:
EXCUSABLE HOMICIDE
F.S. 782.03
The killing of a human being is excusable, and therefore lawful, under the following circumstances:
1. When the killing is committed by accident and misfortune in doing any lawful act by lawful means with usual ordinary caution and without any unlawful intent, or

*312 2. When the killing occurs by accident or misfortune in the heat of passion, upon any sudden and sufficient provocation, or
3. When the killing results from a sudden combat, without any dangerous weapon being used and not done in a cruel and unusual manner.
In resolving this case, we have also observed the possibility that the long-form standard jury instruction on excusable homicide also may mislead. The long-form instruction is quite clear if only subhead 3 is deemed to be applicable because a killing resulting from sudden combat cannot be excusable homicide if a dangerous weapon is used. However, if subheads 1, or 2, or both are read together with subhead 3, a jury could understand the words in subhead 3, which read "[h]owever, if a dangerous weapon was used in the combat or the killing was done in a cruel or unusual manner, the killing is not excusable," also to refer to the description contained in subheads 1 and 2. Therefore, we hereby amend the long-form instruction on excusable homicide that appears on page 76 of the Standard Jury Instructions to read:
EXCUSABLE HOMICIDE
F.S. 782.03
An issue in this case is whether the killing of (victim) was excusable.
The killing of a human being is excusable, and therefore lawful, if committed by accident and misfortune.
In order to find the killing was committed by accident and misfortune, you must find the defendant was:
Give 1, 2 or 3 as applicable
1. a. doing a lawful act by lawful means and with usual care and
b. acting without any unlawful intent.
2. in the heat of passion brought on by a sudden provocation sufficient to produce in the mind of an ordinary person the highest degree of anger, rage or resentment that is so intense as to overcome the use of ordinary judgment, thereby rendering a normal person incapable of reflection.
3. engaged in sudden combat. However, a killing that occurs during sudden combat cannot be excusable if a dangerous weapon was used or the killing was done in a cruel and unusual manner.
Definition
A "dangerous weapon" is any weapon that, taking into account the manner in which it is used, is likely to produce death or great bodily harm.
Although the trial court's instruction was not fundamental error, our review does not end there because we find merit in Smith's cross-petition in which he claims the district court failed to find other errors that deprived him of a fair trial. First we consider a series of claims that involve the testimony of Estes.
Smith argues that the trial court erred initially when it granted the state's motion to call Estes as a court witness. Section 90.615 of the Florida Statutes (1985) provides a trial court the discretion to call a court witness when necessary to serve the interests of justice.
Permitting a court to abandon its position of neutrality by calling a witness as its own was intended to prevent the manifest injustice which might occur if the testimony of an eyewitness to a crime was not placed before the jury because of the inability of either party to vouch for that witness.
Jackson v. State, 498 So.2d 906, 909 (Fla. 1986). A party may move to have a witness called as a court witness if that party produces evidence to show, for example, that the witness has become uncooperative, or that the party cannot vouch for the witness's credibility because of the witness's adverse, prior inconsistent statements. Brumbley v. State, 453 So.2d 381, 384 (Fla. 1984).
Smith argues that the trial court should not have called Estes as a court witness because Estes had cooperated with the state by giving numerous statements that were not materially inconsistent. We agree.
*313 The record shows that Estes cooperated with the authorities. Although shaken by the events, she gave numerous statements to investigators both at the scene and during the subsequent investigation. The record also shows that Estes' prior statements were not materially inconsistent such as to render the state unable to vouch for her credibility. To be inconsistent, a prior statement must either directly contradict or materially differ from the expected testimony at trial. That includes allowing "witnesses to be impeached by their previous failure to state a fact in circumstances in which that fact naturally would have been asserted." Jenkins v. Anderson, 447 U.S. 231, 239, 100 S.Ct. 2124, 2129, 65 L.Ed.2d 86 (1980). However, omissions must be of a material, significant fact rather than mere details. Our review of the record does not reveal adverse, material inconsistencies such as to warrant the severe measure of calling Estes as a court witness. Furthermore, Estes' relationship with Smith did not discredit her credibility enough to justify calling her as a court witness, although it may have been raised as impeachment evidence to show bias.
Another claim regarding Estes' testimony focuses on the trial court's decision to allow the state to show her autopsy photographs of Cascio's body, which caused her to become upset and sob out loud. When Estes broke into tears, Smith moved for a mistrial, but the motion was denied. Smith claims this was error because Cascio's body already had been identified, so the only reason for showing Estes the photographs was to upset the witness and inflame the jury. Again we are compelled to agree that the trial court erred.
Before Estes testified, an associate medical examiner identified Cascio for the jury by referring to those autopsy photographs. Nonetheless, the prosecutor showed those photos to Estes, contending that his sole purpose was to have her identify Cascio. Yet we can find in this record no valid reason for showing the gruesome photographs to Estes once the body had been identified, especially when the only issue contested at trial was Smith's reason for killing Cascio. The evidence also was cumulative and unfairly prejudicial. § 90.403, Fla. Stat. (1985).
The third claim regarding Estes' testimony concerns the admission as substantive evidence of certain alleged prior inconsistent statements. Smith argues that the trial court erred by allowing the state to rely upon those statements as substantive evidence of guilt, rather than for the limited purpose of impeachment.
There can be no question that evidence of a prior inconsistent statement offered as impeachment is admissible only for that purpose unless it is independently admissible on other grounds. E.g., Dudley v. State, 545 So.2d 857, 859 (Fla. 1989). Such evidence generally is hearsay and usually does not satisfy the demands of reliability necessary to prove an essential element of a crime or defense. The purpose of admitting evidence of prior inconsistent statements is to test the credibility of a witness whose testimony was "harmful to the interest of the impeaching party." Brumbley, 453 So.2d at 385. That purpose is disserved when this hearsay evidence is used as substantive evidence of guilt. Using the guise of impeachment to introduce hearsay testimony as substantive evidence is "little more than a thinly veiled artifice to place before the jury that which would be otherwise inadmissible." Jackson, 498 So.2d at 909; see also Adams v. State, 34 Fla. 185, 195-96, 15 So. 905, 908 (1894); Kingery v. State, 523 So.2d 1199, 1204 (Fla. 1st DCA 1988) ("In the event a witness's statement meets the criteria for adverseness, his prior inconsistent statements are admissible for impeachment purposes, but may not be used as substantive evidence."). As we said recently in Dudley, it is reversible error for a trial court to call a court witness so that her prior statements can be used against her, and then to allow those prior statements to be used as substantive evidence of guilt. Dudley, 545 So.2d at 859. In this instance there are two different types of prior statements at issue, and each requires separate analysis.
Estes made one of her prior statements under oath to a prosecutor and a *314 deputy sheriff in the presence of a court reporter. The state introduced that evidence not only to impeach but also as substantive evidence given during an "other proceeding" within the meaning of section 90.801(2)(a) of the Florida Statutes (1985). Smith relies on State v. Delgado-Santos, 497 So.2d 1199 (Fla. 1986), adopting 471 So.2d 74 (Fla. 3d DCA 1985), arguing that the interrogation did not satisfy the statute's requirement, so the trial court should not have allowed the jury to consider the statement as substantive evidence to prove the truth of the matter asserted. The state cites Diamond v. State, 436 So.2d 364 (Fla. 3d DCA 1983), arguing that the trial court properly applied the statute to admit the evidence.
Section 90.801(2)(a) allows a prior inconsistent statement to be admitted as substantive evidence to prove the truth of the matter asserted when it meets the narrow criteria of the statute, provided that the declarant testifies at trial. Moore v. State, 452 So.2d 559 (Fla. 1984). In Delgado-Santos, we established a bright-line rule that a law enforcement investigative interrogation conducted by the police, even if under oath, is not an "other proceeding" pursuant to section 90.801(2)(a). Accord Dudley v. State, 545 So.2d 857, 859 (Fla. 1989); Kirkland v. State, 509 So.2d 1105 (Fla. 1987).
This Court adopted as its own the three-part rationale of the district court's opinion in Delgado-Santos, concluding that section 90.801(2)(a) was intended to be a very narrow provision. First, it looked to the history and interpretation of the statute's federal analogue, Federal Rule of Evidence 801(d)(1)(A).
[T]he congressional history of the expression "other proceeding" demonstrates that its insertion by the conference committee represented a compromise between the version drafted by the advisory committee and approved by the Senate, which permitted the substantive use of any prior inconsistent statement, S.Rep. No. 1277, 93rd Cong., 2d Sess. (1974), and that adopted by the House, which required that the statement have been given at a trial, hearing or deposition under oath and subject to cross-examination. H.R.Rep. No. 650, 93rd Cong., 2d Sess. (1974). It is clear that the "other proceeding" language, taken with the dropping of the cross-examination requirement, "covers statements before a grand jury." H.R.Rep. No. 1597, 93rd Cong., 2d Sess. (1974) (Conference Committee Report) reprinted in U.S.C.A. The Federal Rules of Evidence and in 4 U.S.Code Cong. & Adm.News 7104 (1974), quoted in United States v. Castro-Ayon, 537 F.2d 1055, 1057 n. 3 (9th Cir.1976), cert. denied, 429 U.S. 983, 97 S.Ct. 501, 50 L.Ed.2d 594 (1976). It is just as plain, however, in the light of the far more restrictive House language which was only slightly expanded, that the term should not be applied to any situation which is not at least close to that analogue. As two commentators have stated,
the term "other proceeding" ... was intended to inject into the Rule the stricter limitations of the House version ... lest the meaning of the compromise be read out of the Rule.
Case Comment, Federal Rule of Evidence 801(d)(1)(A)  Prior Inconsistent Statements  Scope of the Term "Other Proceeding"  United States v. Castro-Ayon, 537 F.2d 1055 (9th Cir.1976), 10 Loy.L.A.L.Rev. 497, 503 (1977);
the only appropriate construction of the term "other proceeding" is a narrow one... . [T]o give [it] a liberal construction is to undermine the foundation of reliability that Congress sought to establish for this Rule.
Note, United States v. Castro-Ayon: An Interpretation of Federal Rule of Evidence 801(d)(1)(A), 10 SW.U.L.Rev. 985, 987 (1978).
Delgado-Santos, 471 So.2d at 76-77 (footnote omitted) (emphasis in original).
Delgado-Santos, next relied on the standard rules of statutory construction to conclude that "an `other proceeding' must be no less formal than a deposition and no more so than a hearing." Id. at 77. Finally, the Court looked to the word "proceeding" itself and determined that it implies "a degree of formality, convention, structure, *315 regularity and replicability of the process in question." Id.
Based on this rationale, and supported by the "overwhelming weight of authority," id. at 78, the Court concluded that a police investigative interrogation cannot qualify as a "proceeding" within the meaning of section 90.801(2)(a).
[I]t seems obvious to us on the face of it that no process of police questioning  much less one of the kind involved here  can qualify as a 90.801(2)(a) "proceeding." Investigative interrogation is neither regulated nor regularized; it contains none of the safeguards involved in an appearance before a grand jury and does not otherwise even remotely resemble that process; and it has no quality of formality and convention which could arguably raise the interrogation to a dignity akin to that of a hearing or trial.
Id. The Court then expressly rejected the analysis of other cases where the statutory interpretation turned on the question of whether the statement was "reliable."
In our view, the basic flaw in this conclusion is that it finds no basis in the statute. While the legislature and Congress may have been ultimately concerned with the "reliability" of a particular statement, they sought to vindicate that concern only by establishing given and objective criteria as to the circumstances, including the kind of forum, under which it was given. And it is for the legislature, not the courts, to determine not only the policy to be promoted, but the means by which that end is to be achieved. 10 Fla.Jur.2d Constitutional Law § 147 (1979). By suggesting, without statutory authority, that the determination that the existence of a proceeding can depend upon what is said before it, the [Robinson v. State, 455 So.2d 481 (Fla. 5th DCA 1984) and State v. Smith, 97 Wash.2d 856, 651 P.2d 207 (1982)] test of reliability7 violates this basic principle.
7 It should be noted, in contrast, that other provisions of the code explicitly render the court's assessment of the value of the particular item of evidence a condition of admissibility. See sec. 90.804(2)(c), Fla. Stat. (1981) ("A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is inadmissible, unless corroborating circumstances show the trustworthiness of the statement."); Maugeri v. State, 460 So.2d 975 (Fla. 3d DCA 1984) [, dismissed, 469 So.2d 749 (Fla. 1985)].
In the absence of such a provision in [section] 90.801(2)(a), the Robinson-Smith rationale, rendering a "reliable" statement admissible although there would otherwise be no "proceeding," would amount to the enactment of a catch-all or umbrella exception for the admission of trustworthy hearsay which does not fall within any of the specific exceptions. This principle is contained in the federal rules, 804(b)(5), but was pointedly not adopted in Florida.
Delgado-Santos, 471 So.2d at 79; accord Kirkland v. State, 509 So.2d 1105, 1106 (Fla. 1987) ("the fact that Ms. Bass' statement may have been more reliable than the one given by the defendant's accomplice in State v. Delgado-Santos is irrelevant").
Thus, the question in this case is whether, under the statute, the Delgado-Santos rationale applies to a prosecutor's investigative interrogation. We conclude that it must.[3] When Estes gave the statement at issue, she was brought into a room where a deputy sheriff and a prosecutor were waiting with a court reporter to interrogate the seventeen-year-old about a homicide in which she had just been involved. No counsel was present to advise her or to protect Smith's interests; no cross-examination was possible; and no judge was present or made available to lend an air of fairness or objectivity. This prosecutorial interrogation was "neither regulated nor regularized," Delgado-Santos, 471 So.2d at 78; it contained "none of the safeguards *316 involved in an appearance before a grand jury" and did not "even remotely resemble that process," id.; nor did it have any "quality of formality and convention which could arguably raise the interrogation to a dignity akin to that of a hearing or trial." Id. At bottom, prosecutorial interrogations such as the one here provide no "degree of formality, convention, structure, regularity and replicability of the process" that must be provided pursuant to the statute to allow any resulting statement to be used as substantive evidence to prove the truth of the matter asserted. Id. at 77. Therefore, the trial court erred by allowing the jury to consider Estes' prior statement to the prosecutor as substantive evidence.
We note that the Third District Court of Appeal reached a contrary result in Diamond v. State, 436 So.2d 364 (Fla. 3d DCA 1983). However, that court did not have the benefit of our subsequent analysis in Delgado-Santos, nor did it attempt to analyze why a prosecutor's interrogation should be considered a "proceeding" within the meaning of the statute. Thus, Diamond has no persuasive value here, and it is disapproved to the extent that it is inconsistent with this analysis.
Smith also argues that the trial court erroneously allowed the state to rely upon impeachment evidence of Estes' other allegedly prior inconsistent statements as substantive evidence of guilt. The state argues that we should follow the district court's conclusion that there was no error here because Smith rejected efforts of the trial court to give a cautionary instruction.[4]
Section 90.107 of the Florida Statutes (1987) provides:
When evidence that is admissible as to one party or for one purpose, but inadmissible as to another party or for another purpose, is admitted, the court, upon request, shall restrict such evidence to its proper scope and so inform the jury at the time it is admitted.
(Emphasis supplied.) The record reveals that the only time Smith sought a cautionary instruction was in a discussion immediately before the state introduced the recorded prosecutorial interrogation of Estes that we addressed above. Because no requests for instructions were made contemporaneous to the introduction of other alleged prior inconsistent statements, the trial court did not err by failing to specially instruct the jury.
Smith's last contention concerning the testimony of Estes is that the trial court erred by admitting into evidence one of Estes' statements containing inadmissible evidence of Smith's drug use. We agree that the evidence of Smith's bad character should not have been presented to the jury. § 90.404, Fla. Stat. (1985). However, because Smith did not timely object to the admissibility of that evidence, we find no error.
Moving on to other portions of the trial, Smith argues that the trial court violated his constitutional right to silence[5] by allowing the prosecutor to introduce evidence about what Smith did not say when he made a spontaneous statement at the scene of the killing, and then allowing the state to argue those points in its summation. We agree.
The state adduced the following testimony from Deputy Kerschner as substantive evidence in the state's case-in-chief to defeat Smith's claim of self-defense:
Q [by Mr. Miller, for the state]: At that time, did you hear him [Smith] make any spontaneous statements to yourself and Deputy Cosimi?

*317 A He continually said that, "You've got the wrong person. I haven't done anything."
Q Did he indicate to you shortly thereafter that he had done something, to Deputy Cosimi?
A Yes, he did.
Q What did he tell you at that point?
A He told myself and Deputy Cosimi that, "I just shot someone. He was going for my daughter."
Q Now, what, if anything, did this Roland Smith say at that time, of being frightened of the victim of this case? What, if anything at all?
MR. MANDER [for the defendant]: Objection. Can we approach the bench?
In conference, the defense objected because the question invited a comment on Smith's right to silence.[6] The trial court overruled the objection, after which the following colloquy took place:
Q [By Mr. Miller] Deputy, at the time you heard these statements being made to Deputy Cosimi, what, if anything, did this defendant say about being frightened of the victim of this case?
A None.
MR. MANDER: I would renew the objection just made in its entirety.
THE COURT: Thank you. The same ruling [objection overruled].
Q [By Mr. Miller] Deputy Kerschner, at the time you heard these statements being made to Deputy Cosimi, what, if anything, was said by the defendant about the victim being sexually aggressive or assaulting his daughter?
MR. MANDER: Objection. Leading.
MR. MILLER: I phrased it, what, if anything.
THE COURT: Well, all right. I'll overrule the objection.
Q [By Mr. Miller] What, if anything, did you overhear the defendant say at that time about his daughter being sexually assaulted by the victim in this case?
A None.
Q What 
MR. MANDER: I will make the same objection that I made at the bench previously, Judge. He's doing indirectly what he is not allowed to do directly, violating my client's constitutional rights.
THE COURT: Same ruling [objection overruled].
Q [By Mr. Miller] Deputy, the same time you overheard these statements of Deputy Cosimi, what, if anything, did you hear this defendant say to Deputy Cosimi at that time that he was acting in self-defense?
A None.
MR. MANDER: Same objection, Judge.
THE COURT: Same ruling.
The state later summed up that evidence in its closing argument:
[A]t that time when that statement was made Deputy Kerschner never heard anything about fighting or refusing to leave. He specifically answered questions and said he didn't say anything about being frightened of Cascio. He didn't say anything about his daughter being sexually attacked. He didn't say anything about acting in self-defense... .
Our cases have made clear that courts must prohibit all evidence or argument that is fairly susceptible of being interpreted by the jury as a comment on the right of silence. E.g., State v. DiGuilio, 491 So.2d 1129 (Fla. 1986); State v. Kinchen, 490 So.2d 21 (Fla. 1985); Starr v. State, 518 So.2d 1389 (Fla. 4th DCA 1988); Hosper v. State, 513 So.2d 234 (Fla. 3d DCA 1987). "The prosecution is not permitted to comment upon a defendant's failure to offer an exculpatory statement prior to trial, since this would amount to a comment upon the defendant's right to remain silent." Hosper, 513 So.2d at 235 (citations omitted).
*318 For example, in Starr, the defendant was charged with trafficking in cocaine by being in actual or constructive possession of the drug. The theory of defense at trial was that Starr had discovered a magazine in the bushes, brought it into his house, and therein discovered the contraband. In an attempt to ridicule Starr's defense, the state offered evidence to show Starr's failure to explain to police how he acquired a magazine with contraband in it. The state also commented to the jury several times about that in closing argument. The court found constitutional error. Likewise, in Murphy v. State, 511 So.2d 397 (Fla. 4th DCA 1987), the court found constitutional error in argument and testimony concerning a witness's statement that he did not hear the defendant deny ownership of cocaine found in the defendant's car. See also, e.g., DiGuilio, 491 So.2d at 1131; Lee v. State, 422 So.2d 928 (Fla. 3d DCA 1982), review denied, 431 So.2d 989 (Fla. 1983). The trial court below erred by allowing the jury to hear the evidence and argument quoted herein.
Finally, Smith argues that the trial court erred when it barred defense witnesses other than Smith from testifying about specific acts of violence allegedly committed by Cascio. Smith was allowed to testify to specific acts of violence that he knew about, but the trial court did not allow other witnesses to testify as to specific acts of violence allegedly committed by Cascio and known to those witnesses. We agree with Smith and find error.
A defendant's testimony that he or she knew about specific acts of violence committed by the victim is relevant to show, as asserted here, the reasonableness of the defendant's apprehension to support a self-defense claim. §§ 90.404(1)(b)(1), .405(2), Fla. Stat. (1985). E.g., Palm v. State, 135 Fla. 258, 184 So. 881 (1938); Sanchez v. State, 445 So.2d 1 (Fla. 3d DCA 1984); Smith v. State, 410 So.2d 579 (Fla. 4th DCA), review denied, 419 So.2d 1200 (Fla. 1982); Williams v. State, 252 So.2d 243 (Fla. 4th DCA), cert. denied, 255 So.2d 682 (Fla. 1971). Testimony that other people knew of specific acts of violence committed by the victim is not relevant because it sheds no light on the defendant's state of mind; it shows only that the victim had a propensity for violence. See Taylor v. State, 513 So.2d 1371 (Fla. 2d DCA 1987). Although reputation evidence may be valid for that purpose, "specific act" evidence is not. § 90.405, Fla. Stat.; see, e.g., Smith, 410 So.2d at 580-81.
However, "specific act" testimony of third parties may be admissible as corroborative evidence if it is first shown that the defendant knew about the very same acts of violence. Such corroborative evidence should be admitted cautiously in light of the need to limit evidence of specific acts because, inter alia, a jury may tend to give the evidence too much weight, or it may sidetrack the jury's focus. See generally C. Ehrhardt, Florida Evidence § 405.3 (2d ed. 1984).
The record shows that Smith already had testified that Cascio told him about Cascio's involvement with three specific violent incidents. Smith called witnesses to corroborate that these specific acts of violence took place. That evidence would have been admissible to support Smith's credibility provided that the proper foundation was established. However, the trial court remains free to exercise discretion to limit such evidence consistent with the policies of the Florida Evidence Code. See §§ 90.403-.405, Fla. Stat. (1985). The trial court erred by barring that evidence completely.
For the reasons stated above, we approve the district court's decision ordering a new trial, but we quash the opinion and remand for proceedings consistent with this opinion.
It is so ordered.
SHAW, C.J., and McDONALD, EHRLICH, BARKETT, GRIMES and KOGAN, JJ., concur.
OVERTON, J., concurs in part and dissents in part with an opinion.
OVERTON, Justice, concurring in part and dissenting in part.
I concur with all parts of the opinion except that part holding that testimony given *319 to an assistant state attorney under oath before a court reporter was not admissible as substantive evidence under section 90.801(2), Florida Statutes (1985), because it was not an "other proceeding" under the provisions of that section. I strongly dissent from that holding and find it not required by State v. Delgado-Santos, 497 So.2d 1199 (Fla. 1986), and Dudley v. State, 545 So.2d 857 (Fla. 1989).
I find that the factual situation in this case is distinguishable from Delgado-Santos and Dudley because here the subject statement was given under oath to an assistant state attorney before a court reporter. Testimony under oath before the state attorney is as much an "other proceeding" in our criminal justice structure as is testimony under oath before a grand jury. As this Court clearly acknowledged in Delgado-Santos, the "other proceeding" language in the statute includes testimony that is presented before a grand jury, and such testimony is admissible.
Our constitution gives the state attorney the same power and authority that the grand jury possesses to charge defendants with most felony offenses. The constitution states, in article I, section 15(a): "No person shall be tried for capital crime without presentment or indictment by a grand jury, or for other felony without such presentment or indictment or an information under oath filed by the prosecuting officer of the court... ." (Emphasis added.) To ensure that the state attorney has the means to carry out this responsibility, the legislature granted that officer the power to subpoena witnesses to testify ex parte under oath concerning a criminal offense before a criminal offense is charged. Section 27.04, Florida Statutes (1989), reads as follows:
The state attorney shall have summoned all witnesses required on behalf of the state; and he is allowed the process of his court to summon witnesses from throughout the state to appear before him in or out of term time at such convenient places in the state attorney's judicial circuit and at such convenient times as may be designated in the summons, to testify before him as to any violation of the criminal law upon which they may be interrogated, and he is empowered to administer oaths to all witnesses summoned to testify by the process of his court or who may voluntarily appear before him to testify as to any violation or violations of the criminal law.
This state is one of only four jurisdictions which grant this special power to the chief prosecuting officer.[7]
Florida Rule of Criminal Procedure 3.140(g) implements this significant power and expressly requires testimony under oath from material witnesses as a prerequisite for a state attorney to file an information against a defendant. Rule 3.140(g) states, in pertinent part:
An information charging the commission of a felony shall be signed by the state attorney, or a designated assistant state attorney, under oath stating his good faith in instituting the prosecution and certifying that he has received testimony under oath from the material witness or witnesses for the offense.

(Emphasis added.) The rule was written in this way to ensure that an information charging the commission of a felony would be based upon testimony taken directly from material witnesses  not upon hearsay or information and belief. In adopting this rule, we recognized that this "proceeding" before the state attorney substitutes for testimony before a grand jury and eliminates the necessity of an indictment by a grand jury for a noncapital felony.
Our constitution says that no person shall be tried without "indictment by a grand jury ... or an information under oath filed by the prosecuting officer." Art. I, § 15(a), Fla. Const. The majority, however, says that testimony supporting an indictment is an "other proceeding" and is admissible, while testimony forming the basis for the filing of an information is not from an "other proceeding" and is not admissible. Interestingly, in both circumstances, *320 the testimony is under oath, is secret, is without cross-examination, is transcribed, and is the basis for charging a crime. Testimony under oath is clearly distinguishable from statements made before an investigating police officer or deputy sheriff. I agree that such statements have not been given in an "other proceeding" and are not admissible. However, I find that testimony of a witness before a state attorney or assistant state attorney under oath before a court reporter is, in our criminal-charging scheme, testimony that has the same effect as testimony before a grand jury. This procedure is expressly authorized by article I, section 15(a), of the Florida Constitution, and by section 27.04, Florida Statutes (1989). We have regulated the process by our rule 3.140(g), Florida Rules of Criminal Procedure. State v. Williams, 362 So.2d 678, 679 (Fla. 4th DCA 1978), dismissed, 368 So.2d 1376 (Fla. 1979), properly explained the regulatory significance of this rule in this manner:
The predecessor of the current rule required that an information charging a felony should be signed by a State Attorney under oath, stating only his good faith in instituting the prosecution. There was no requirement that he certify that he had received the testimony under oath from the material witnesses. That requirement was added effective March 31, 1975, "to establish good faith in the institution of the prosecution and provide more accountability" according to the Author's Comment following Rule 3.140. 33 F.S.A. p. 121. In other words, before any felony prosecution is instituted by filing an information the prosecutor must certify that the facts upon which the prosecution is based have been sworn to by the material witnesses.
(Footnote omitted.)
In conclusion, to say, on the one hand, that testimony forming the basis for an indictment by a grand jury is admissible, while saying on the other that testimony forming the basis for an information is not admissible, makes no legal sense. I find that testimony taken by the state attorney under oath before a court reporter to support an information is reliable evidence that is regulated. It is testimony for which a witness may be charged with perjury. In my view, it clearly is testimony from an "other proceeding" which is authorized by statute and implemented by our rules.
Fortunately, the majority holding is one that the legislature can correct, and I suggest that it examine this matter for appropriate legislative action.
NOTES
[1] We have jurisdiction pursuant to article V, section 3(b)(4) of the Florida Constitution.
[2] We are aware that the Supreme Court's Committee on Standard Jury Instructions in Criminal Cases presently is reviewing both the short-form and long-form instructions for excusable homicide. Our revisions here do not preclude the committee from recommending further modification to the instructions in this opinion, if needed.
[3] In Dudley v. State, 545 So.2d 857 (Fla. 1989), this Court held inadmissible as substantive evidence a prior inconsistent statement of a court witness, who made the statement "during the investigation" to "a detective and an assistant state attorney." Id. at 858 (emphasis supplied). As here, we reached our conclusion by relying on State v. Delgado-Santos, 497 So.2d 1199 (Fla. 1986), adopting 471 So.2d 74 (Fla. 3d DCA 1985). Although the facts in Dudley seem to be remarkably similar to those in this case, Dudley does not directly control this issue here because it is unclear from the opinion in Dudley exactly why the Court held that the statement failed to satisfy the requirements of section 90.801(2)(a) of the Florida Statutes (1985).
[4] The district court concluded that Smith "rejected the opportunity to have the jury" instructed as to the limited purpose for which the prior statements were admitted. Our review of the record does not support the district court's conclusion. However, because Smith did not make contemporaneous requests for instructions pursuant to section 90.107 of the Florida Statutes (1987), it does not matter whether Smith affirmatively rejected the instruction or silently waived his statutory right to such an instruction.
[5] Smith did not specify whether he asserts his right to silence based on state or federal constitutional grounds. Consequently, we draw no distinction between the two in this case.
[6] Apparently, Smith made the quoted statement when he was in custody at the scene of the killing, but before he had been advised of his rights under Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Smith does not challenge the admissibility of his initial statement to police. His claim goes only to the prosecutor's argument and questions asked of witnesses about what Smith did not say in his statement.
[7] The other three states are Arkansas, Kansas, and Louisiana. See Ark.Stat.Ann. § 43-801 (1977); Kan. Stat. Ann. § 22.3101 (1981); La. Code Crim. Proc.Ann. art. 66 (West Supp. 1987).